Michael F. Ram (SBN 104805)
Marie N. Appel (SBN 187483)
Jean Martin (*To Be Admitted Pro Hac Vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone:  (415) 358-6913
Facsimile:  (415) 358-6923
Email:       mram@forthepeople.com
             mappel@forthepeople.com
             jeanmartin@forthepeople.com

Micah S. Adkins (*To Be Admitted Pro Hac Vice*)
**The Adkins Firm, P.C.**
1025 Westhaven Blvd., Suite 220
Franklin, Tennessee 37064
Telephone:  (615) 370-9659
Email:       michaeladkins@itsyourcreditreport.com

*Attorneys for Plaintiff*

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW BECKER, *individually and on behalf of all others similarly situated,*<br><br>                    Plaintiff,<br><br>v.<br><br>LISI, LLC and AMWINS GROUP, INC,<br><br>                    Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT               1

Plaintiff Matthew Becker, on behalf of himself and all others similarly situated, alleges the following against Defendant LISI, LLC. and Defendant AmWINS Group, Inc. (collectively "Defendants"), based on personal knowledge as to himself and on information and belief as to all other matters based upon, inter alia, the investigation conducted by and through Plaintiff's counsel:

## PARTIES

1.    Plaintiff Matthew Becker is, and for all relevant times has been, a resident of Spring, Texas. Plaintiff enrolled in a life and disability insurance plan with Metropolitan Life Insurance Company ("MetLife") in or around March 2018.

2.    In or around July 2020, Plaintiff received a "Notice of Data Breach" letter dated July 15, 2020 ("Notice"), from LISI, LLC, an "insurance broker and business associate of MetLife,"[1] stating that an employee's email account was hacked by an unauthorized third party who obtained insureds' personal identifying information[2] ("PII") and other account information (the "Data Breach").

3.    According to the Notice, as part of the Data Breach, emails containing customer PII were disseminated from a LISI email account to an unauthorized third party. Plaintiff's and class members' names, Social Security numbers, dates of birth, and insurance information, including insurance Plan

---

[1] *See* Notice of Data Breach attached as <u>Exhibit 1</u>.

[2] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

Tier, were accessed by the unauthorized party and exfiltrated out of the LISI's data systems.

4.    Plaintiff and class members have suffered actual injury from having their PII compromised and stolen in and as a result of the Data Breach.

5.    After receiving notice of the Data Breach, Plaintiff expended his personal time to enroll in the credit monitoring product offered by LISI.

6.    Because of the limited services and protections offered by the IdentityWorks service offered by LISI, Plaintiff researched and purchased an additional credit and identity theft monitoring product from Norton's LifeLock at an annual cost of $100. Plaintiff would not have purchased this product but for the Data Breach.

7.    Since the Data Breach, Plaintiff has had fraudulent accounts opened using his PII and has had to spend time dealing with collection agencies calling to collect overdue balances on those accounts. Plaintiff has also received unwanted and unsolicited calls to his home and cell phone for various services.

8.    Plaintiff has also suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his PII being placed in the hands of criminals who have already misused such information, upon information and belief, as evidenced by the unwanted phone calls Plaintiff continues to receive.

9.    Defendant LISI, LLC ("LISI") is a general insurance agency. LISI is a California LLC with its principal place of business and headquarters located at 1600 W. Hillsdale Blvd., Suite 201, San Mateo, California 94402.

10.    LISI, one of the largest general agencies in California, provides services and resources to insurance brokers and agencies of all sizes. LISI has six offices across the state of California.[3]

---

[3] *See* https://www.lisibroker.com/about (Last accessed April 10, 2021).

11.   As a general agency, LISI partners with various insurance carriers to market and distribute their products to agents and brokers. LISI considers itself an expert on product portfolios, underwriting guidelines, eligibility, rates, and all other relevant carrier information.

12.   LISI partners with all the major insurance carriers in California and is paid by them through overrides on business that is sold through LISI.

13.   One of LISI's partners is MetLife.[4] MetLife is a leading global provider of insurance, annuities, and employee benefit programs. MetLife companies offer life, accident and health insurance, retirement and savings products through agents, third-party distributors such as banks and brokers, and direct marketing channels. Through its subsidiaries and affiliates, MetLife holds leading market positions in the United States, Japan, Latin America, Asia, Europe, the Middle East, and Africa.[5]

14.   Defendant AmWINS Group, Inc. ("AmWINS") is the parent company of Defendant LISI. Defendant AmWINS is a Delaware corporation with its principal place of business located at 4725 Piedmont Row Drive, Suite 600, Charlotte, North Carolina 28210.

15.   AmWINS is a global specialty insurance distributor with expertise in property, casualty, professional lines, and specialty group benefits products. AmWINS is based in Charlotte, North Carolina, but operates through more than 115 offices globally and handles premium placements in excess of $16 billion dollars annually.[6]

16.   On August 7, 2019, AmWINS announced that it signed a definitive

---

[4] *See* https://www.lisibroker.com/providers (Last accessed April 10, 2021).

[5] *See* https://www.metlife.com/about-us/corporate-profile/global-locations/ (Last accessed April 10, 2021).

[6] *See* https://www.amwins.com/about-us/our-company (Last accessed April 10, 2021).

agreement to acquire LISI. Under the agreement, LISI became part of AmWINS's Group Benefits division, which works in partnership with brokers and consultants as well as carrier providers to provide brokerage, underwriting and administrative/outsourcing services.[7]

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because at least one putative class member is diverse from at least one Defendant.

18.     The Court has personal jurisdiction over Defendants as they are authorized to and regularly conduct business in this District.  Defendant LISI maintains its principal place of business and headquarters in this District.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District.

## FACTUAL BACKGROUND

20.     On or around July 15, 2020, LISI sent a letter to Plaintiff and similarly situated Class Members notifying them of its finding that emails from an employee email account were forwarded from that employee's email account to an unauthorized third party ("the Breach Notice").[8]

21.     The Breach Notice sent by LISI was signed by Donna Hargrove, General Counsel for AmWINS Group.

---

[7] See https://www.businesswire.com/news/home/20190807005413/en/AmWINS-Group-Acquire-LISI-CoPower (Last accessed April 10, 2021).

[8] See Exhibit 1.

22.     The Breach Notice stated that the emails were forwarded from the employee's email account to the third party between March 6, 2020 and May 5, 2020 ("Data Breach").

23.     LISI did not indicate when it first became aware of the Data Breach, but stated that on May 29, 2020, LISI reviewed the contents of the forwarded emails and determined that the information disseminated from its data systems contained the names, Social Security Numbers, dates of birth, and insurance plan tiers of Plaintiff and Class Members.

24.     As a result of and in recognition of the seriousness of the breach, Defendants offered a 12-month membership of Experian's IdentityWorks. Defendants also cautioned Plaintiff and Class Members to "remain vigilant against incidents of identity theft and fraud," to review their account statements, and to monitor their credit reports for suspicious activity.[9]

25.     Not only was the Breach Notice alarming to Plaintiff, but it provided no reassurance that Defendants took any steps to retrieve his PII.

26.     Upon information and belief, as of the filing of this Complaint, Defendants have neither notified the Office of Civil Rights nor the California's Attorney General's Office as to the Data Breach.[10]

27.     Defendants have disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that Defendants did not have adequately robust data security practices and protocols to safeguard PII; failing to take standard and reasonably available steps to prevent the Data Breach;

---

[9] *See Id.*

[10] A search conducted of publicly available notices for data security breaches at various times through April 10, 2021 returned no notices of data breach to either the OCR or the California AG's office on behalf of LISI or AmWINS.

failing to monitor and timely detect the Data Breach; and failing to provide Plaintiff and Class Members with prompt and accurate notice of the Data Breach.

28.    As a result of Defendants' failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now in the hands of thieves. Plaintiff and Class Members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud.

### *Defendants Collect, Store, and Maintain PII*

29.    In their ordinary course of business, Defendants collect the sensitive, personal information about individuals. Defendants generally collect PII from either the individual directly or through third parties, such as insurance companies. That information is then stored and maintained by Defendants.[11]

30.    Defendants collect, store, and maintain an extraordinary volume of sensitive, personal information. First, Defendants collect, store, and maintain personal identification information, such as an individual's name, date of birth, gender, race/national origin, physical traits, contact details (home and work address, telephone numbers, email addresses), username, password, and password reminder questions and answers for Defendants' online services.[12]

31.    In addition to personal identification information, Defendants also collect, store, and maintain: a) government issued identification information, such as an individual's Social Security number, tax identification number, Medicare number, passport number, military identification number, and driver's license number; b) background data, such as an individual's marital status, family history, educational history, employment history and job titles, and professional

---

[11] *See* https://www.amwins.com/privacy (Last accessed April 10, 2021).
[12] *See Id.*

CLASS ACTION COMPLAINT        7

licenses and affiliations; c) health and medical data, such as current or former physical or mental health conditions, biometric and genetic data, detailed histories of medical procedures or surgeries, previous injuries, disabilities, medication information, medical insurance information, and relevant personal habits such as smoking or drug/alcohol consumption; d) financial data such as an individual's bank account number, income, assets, liabilities, credit history and credit score, and history of insolvency; and e) a host of other sensitive information including but not limited to an individual's history of civil claims and lawsuits, criminal record, job performance, sexual life and preferences, religious beliefs, and preferences for medical treatment.[13]

32.     Given the extortionate amount of information they acquire from individuals, Defendants are acutely aware of their responsibility to ensure that such information is adequately protected.

33.     In their Privacy Statement, Defendants state that they are committed to protecting privacy and the confidentiality of personal information.

34.     Despite representing that Defendants have "implemented physical, electronic and technical safeguards" to protect personal information, "consistent with applicable privacy and data security laws[,]"[14] the details surrounding the Data Breach suggest otherwise.

35.     Defendants failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to highly confidential data.

36.     Defendants had the resources to prevent a breach and to adequately screen and train their employees on the importance of data security but did not utilize them.

---

[13] *See Id.*
[14] *See Id.*

CLASS ACTION COMPLAINT          8

37.    Defendants failed to undertake adequate analyses and testing of their own systems, training their own personnel, and other data security measures to ensure Plaintiff's and Class Members' PII was protected.

38.    Further, Defendants failed to implement best business practices for data security such as multi-factor authentication for email account access, as Defendants stated in the Notice that such practices were implemented only *after* the Data Breach occurred.

### A. Defendants Failed to Comply with Regulatory Guidelines

39.    Federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[15]

40.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[16] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

_____

[15] Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (Last accessed April 10, 2021).
[16] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (Last accessed April 10, 2021).

41.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17]

42.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

43.    The insurance industry is also subject to certain financial regulations related to data security, such as the Gram-Leach-Bliley Act (GLBA) and the arbanes-Oxley Act, NIST, and others.

44.    The GLBA requires insurance companies to protect customers' sensitive data and obligates insurers to train employees on data security and track employee's activities, especially those that relate to accessing protected customers' data.[18]

45.    Additionally, under the GLBA, Defendants are required to monitor systems and procedures to detect actual and attempted attacks on or intrusion into

---

[17] FTC, *Start With Security*, *supra* note 15.

[18] Federal Trade Commission, *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, available at: https://www.ftc.gov/tips-advice/business-center/guidance/financial-institutions-customer-information-complying (Last accessed April 10, 2021).

customer information systems, which Defendants failed to do here.[19]

46.     Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

47.     Defendants were at all times relevant fully aware of their obligation to protect PII. Defendants were also aware of the significant repercussions that would result from their failure to do so.

48.     AmWINS advertises itself as "the leading professional lines insurance wholesale broker in the U.S.," with specialty in "cyber liability."[20] AmWINS promotes that it "has the cyber liability expertise, resources and insurance product to help retailers protect their clients from a myriad of cyber risks. [21]

49.     On January 15, 2015, AmWINS published an online article entitled "The Cost of a Data Breach." In the article, AmWINS appropriately noted that a data breach is not only a "public relations nightmare" for companies, especially when financial data is involved, but also subjects companies to "fines, penalties, and additional costs."[22]

50.     On November 30, 2017, AmWINS published a chart entitled "Data

---

[19] Todd Nunn, *Protecting Customer Data Under the Gramm-Leach-Bliley Action*, Insurance Journal (March 21, 2007), available at: https://www.insurancejournal.com/magazines/mag-legalbeat/2007/03/12/77898.htm (Last accessed April 10, 2021).

[20] *See* https://www.amwins.com/products-services/property-casualty/professional-lines/data-breach-trends-from-amwins-brokerage (Last accessed April 10, 2021).

[21] *See* https://www.amwins.com/solutions/brokerage/professional-lines/cyber-insurance (Last accessed April 10, 2021).

[22] *See* https://www.amwins.com/insights/article/the-cost-of-a-data-breach_1-15 (Last accessed April 10, 2021).

Breach Trends from AmWINS Brokerage" reflecting data breach trends in the third quarter of 2017. In this chart, AmWINS acknowledged that cyber risks are continually evolving. AmWINS recognized that "[t]here were 3,883 breaches reported through the end of September 2017, exposing over 7 billion records." "Compared to the same period in 2016, the number of reported breaches [was] up 18.2% and the number of exposed records [was] up 305%."[23]

51.    Last year, around the same time the Data Breach was occurring, AmWINS launched an exclusive "Cyber Umbrella Program" designed to fill gaps in coverage resulting from "silent cyber incidents." Senior Vice President and Professional Lines Practice Leader of AmWINS David Lewison was quoted stating "The frequency and severity of cyber breaches continues to increase, and while cyber insurance policies are widely available, breaches have begun to bleed into many other lines of insurance."[24]

52.    Defendants are uniquely situated in that they are intimately familiar with the risks posed by storing and maintaining PII. Defendants knew and represented to the public that they understood the increasing rate of data breach attacks and the importance of data security.

### B. Plaintiff and Class Members Suffered Damages

53.    The ramifications of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. Once stolen, fraudulent use of such information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[25]

---

[23] *See* https://www.amwins.com/insights/article/data-breach-trends-from-amwins-brokerage (Last accessed April 10, 2021).
[24] *See* https://finance.yahoo.com/news/amwins-announces-exclusive-cyber-umbrella-100000764.html (Last accessed April 10, 2021).
[25] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (Last accessed April 10, 2021).

54.     In June 2007, the United States Government Accountability Office ("GAO") reported that identity thieves use identifying data, such as Social Security Numbers, to open financial accounts, intercept government benefits, and incur charges and credit in a person's name.[26]  The GAO affirmed that this type of identity theft is the most harmful not only because it can adversely impact the victim's credit rating, but also because it may go unnoticed by the victim for a period of time before discovery. In addition, the GAO Report informs that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records…[and their] good name."[27]

55.     Similarly, the FTC acknowledges that identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[28]  Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[29]

56.     Once PII is stolen, fraudulent use of that information and damage to victims may continue for years to come.

57.     Social Security numbers, which were compromised in the Data Breach, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses.

58.     The Social Security Administration has warned that identity thieves

---

[26] *Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO (June 2007), available at https://www.gao.gov/new.items/d07737.pdf (the "GAO Report") (Last accessed April 10, 2021).
[27] *Id.*
[28] *Guide for Assisting Identity Theft Victims*, FTC (Sep. 2013), available at: https://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (the "FTC Guide") (Last accessed April 10, 2021).
[29] *Id.*

can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.[30] This time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used, compounds an identity theft victim's ability to detect and address the harm.

59.    According to the GOA, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

60.    Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

61.    Social Security numbers, as one would expect, demand a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally

---

[30]    *Identity Theft and Your Social Security Number*, Social Security Administrative *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (Last accessed April 10, 2021).

[31]    *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at* http://www.gao.gov/new.items/d07737.pdf (Last accessed April 10, 2021).

identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

62.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security Number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

63.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

64.    With access to a person's PII, criminals are capable of conducting a myriad of nefarious actions in addition to emptying a victim's bank account. Identity thieves also commit various types of government fraud, such as: obtaining a driver's license or official identification card in the victim's name with the thief's picture or using the victim's name and Social Security number to steal government benefits. Worse, identity thieves may obtain a job using a victim's Social Security number, rent a house, receive medical services in the victim's name, or give the victim's information to police during an arrest,

---

[32]    Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (Last accessed April 10, 2021).

[33]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (Last accessed April 10, 2021).

resulting in an arrest warrant being issued in the victim's name.[34]

65. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[35] As a result of large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, Social Security numbers, and other PII directly on various Internet websites making the information available to the public. These networks and markets consist of hundreds of thousands, if not millions, of nefarious actors who can view and access the PII.

66. The PII belonging to Plaintiff and Class Members is private, sensitive in nature, and was left inadequately protected by Defendants, who did not obtain Plaintiff's or Class Members' consent to disclose such information to any other person as required by applicable law and industry standards.

67. Upon receiving the Notice that his PII had been compromised, Plaintiff immediately took action to investigate whether the breach resulted in any fraud to him.

68. Because of the very limited services and protections offered by Defendants through IdentityWorks, Plaintiff purchased an additional credit and identity theft monitoring product from Norton's LifeLock at a cost of $100.

69. Since the data breach, Plaintiff has experienced an increase in the number of unsolicited telephone calls he receives on both his landline and cell phone.

70. Plaintiff is currently and will continue to suffer actual injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by his PII being placed in the hands of criminals who have already misused

---

[34] FTC Guide, *supra* n.9.
[35] FTC Guide, *supra* n.9.

such information.

71.    On or about September 14, 2020, Plaintiff received a credit monitoring alert from IdentityWorks. The alert notified Plaintiff that a derogatory collection account, Credence Resource Management, LLC, had been added to his credit file. Plaintiff contacted Credence and was told that the collection account was for AT&T U-Verse in the amount of $856.28. Plaintiff was advised that the account was opened and used at some point between December 2019 and May 2020 (the Data Breach occurred in March 2020).

72.    Someone had used Plaintiff's Social Security number to apply for and open the AT&T U-Verse account. The address on the account was an apartment in Austin, Texas, that did not belong to Plaintiff.

73.    Plaintiff disputed the account through IdentityWorks., and Credence flagged the account as fraudulent.

74.    Plaintiff subsequently discovered another fraudulent collection account added to his credit file. Plaintiff received information that someone had created an account with Green Mountain Energy using Plaintiff's PII and was that account was past due. On or about October 2, 2020, Plaintiff called Green Mountain Energy to dispute this account.

75.    On or about October 15, 2020, Plaintiff was contacted by yet another debt collector, Transworld Financial, in an effort to collect on a past due account with Direct Energy. Once again, Plaintiff learned that someone had used his PII to open the account.

76.    Plaintiff disputed the Direct Energy account with Transworld Financial. In response, Transworld Financial identified the account as a fraudulent account.

77.    Plaintiff has spent and continues to spend his valuable time to protect the integrity of his personal information, finances, and credit which is continuously being misused—time which he would not have had to expend but

for the Data Breach.

78.    Plaintiff and Class Members have suffered actual injuries from having their PII exposed as a result of the Data Breach, including, but not limited to: (a) damages resulting from taking the time to search for fraudulent activity; to change banks, bank accounts and debit and credit cards; to purchase credit monitoring and identity theft protection; to call their creditors to provide them with notice of the breach; and to otherwise attempt to protect their financial accounts; (b) damages to and diminution in the value of their PII; and (c) current and impending injury arising from the increased risk of fraud and identity theft.

79.    The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

80.    Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite their obligations to protect PII.  Had Defendants remedied the deficiencies in its data security systems, which, ironically, they encourage other companies to do, and adopted security measures recommended by experts in the field, Defendants would have prevented the theft of PII.

81.    As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and

CLASS ACTION COMPLAINT            18

potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[36]

82.    To date, Defendants have offered inadequate identity monitoring services to affected individuals given the type of data stolen.  The services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

83.    As a result of the Defendants' failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

   a. The compromise, publication, theft, and/or unauthorized use of their PII;

   b. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

   c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from

---

[36] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (Last accessed April 10, 2021).

identity theft and fraud;

d.  The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the PII in its possession; and

e.  Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

84.  In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their PII is secure, remain secure, and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

85.  Plaintiff seeks relief on behalf of himself and as a representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a nationwide class defined as follows:

> All persons whose PII was compromised as a result of the Data Breach announced by Defendants in July of 2020 (the "Class").

86.  Excluded from the Class are the Defendants and any of their affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

87.   Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

88.  The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

89.  **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class Members include many individuals, there is significant risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants. For example, injunctive relief may be entered in multiple cases, but the ordered relief may vary, causing Defendants to have to choose between differing means of upgrading their data security practices and choosing the court order with which they will comply. Class action status is also warranted because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

90.  **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are believed to be so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of individuals affected in the Data Breach is unknown, upon information and belief, it is well in excess of one hundred.

91.  **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

 a.  Whether Defendants had a duty to protect their users' sensitive PII;

 b.  Whether Defendants knew or should have known of the susceptibility of their systems to a data breach;

 c.  Whether Defendants' security measures to protect their systems

were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices;

e. Whether Defendants' failure to implement adequate data security measures allowed the breach of their data systems to occur;

f. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the breach of their systems, resulting in the unlawful exposure of the Plaintiff's and Class Members' PII;

g. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their systems and data network; and,

h. Whether Plaintiff and Class members are entitled to relief.

92. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members. Plaintiff's damages and injuries are akin to other Class Members, and Plaintiff seeks relief consistent with the relief sought by the Class.

93. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because he is a member of the Class he seeks to represent; is committed to pursuing this matter against Defendants to obtain relief for the Class; and has no conflicts of interest with the Class. Moreover, Plaintiff's attorneys are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

94. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule

CLASS ACTION COMPLAINT            22

23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

95.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

96.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

   a.  Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

   b.  Whether Defendants' security measures to protect their data

systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendants failed to take commercially reasonable steps to safeguard PII;

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach;

f. Whether Defendants failed to comply with their statutory and regulatory obligations; and,

g. Whether Plaintiff and the proposed Class are entitled to compensation as a result of Defendants' actions.

97.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names of those affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

98.    Plaintiff restates, realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

99.    By collecting, maintaining, and storing Plaintiff's and Class Members' PII, Defendants had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems and data storage architecture to ensure that Plaintiff's and Class Members' PII was adequately

secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendants' security systems and data storage architecture in a timely manner; (c) timely acting on all warnings and alerts, including public information, regarding Defendants' security vulnerabilities and potential compromise of the PII of Plaintiff and Class Members; (d) maintaining data security measures consistent with industry standards and applicable state and federal law; and (e) timely and adequately informing Plaintiff and Class Members if and when a data breach occurred notwithstanding undertaking (a) through (d) above.

100.   Defendants had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendants knew that it was more likely than not Plaintiff and other Class Members would be harmed by such theft.

101.   Defendants had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PII that was collected, stored, and processed by Defendants' computer systems.

102.   Defendants' duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendants' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty. Plaintiff and Class Members are within the class of persons Section 5 of

the FTC Act (and similar state statutes) were intended to protect.

103.    Defendants' duties to use reasonable data security measures also arose under the California Customer Records Act ("CCRA"), Cal. Civ. Code § 1798.80, et seq., which imposes a duty to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure." Other states have statutes that impose a substantially similar duty of care.

104.    Plaintiff and the Class Members entrusted their PII to Defendants with the understanding that Defendants would safeguard their information.

105.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) and the CCRA (and similar statutes of other states) were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of defendants' failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

106.    Defendants knew or should have known that their computer systems were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII.

107.    Defendants knew or should have known that a breach of their systems would inflict damages upon Plaintiff and the Class, and Defendants were therefore charged with a duty to adequately protect this critically sensitive information.

108.    Defendants breached the duties they owed to Plaintiff and Class Members described above, and thus were negligent. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the breach while it was

ongoing; (c) maintain security systems consistent with industry standards; and (d) timely and adequately informing its customers of the fact and extent of the Data Breach. These failures constituted both violations of the FTC Act (and similar state statutes) and the CCRA (and similar statutes from other states), as well as a breach of duties owed to Plaintiff and Class Members under the common law. Plaintiff's violation of the FTC Act (and similar state statutes) and the CCRA (and similar statutes from other states) constitutes negligence per se and establishes the elements of duty and breach.

109.   Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated, and that they had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiff and the Class.

110.   Defendants also failed to exercise reasonable care and breached their common law duties when they failed to timely notify Plaintiff and Class Members of the Data Breach.

111.   But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and the Class Members, their PII would not have been compromised.

112.   As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal

sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## SECOND CAUSE OF ACTION
**BREACH OF CONFIDENCE**

113. Plaintiff restates, realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

114. Defendants were fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII.

115. As alleged herein and above, Defendants' relationship with Plaintiff and the Class Members was governed by expectations that Plaintiff's and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

116. Plaintiff and Class Members provided their respective PII, which was both confidential and novel, with the explicit and implicit understandings that Defendants would protect and not permit their PII to be disseminated to the public or any unauthorized parties.

117. Plaintiff and the Class Members also provided their respective PII with the explicit and implicit understandings that Defendants would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

118. Defendants voluntarily received in confidence Plaintiff's and Class Members' PII with the understanding that PII was confidential and novel and, as such, would not be disclosed or disseminated to the public or any unauthorized third parties.

119.   Due to Defendants' failure to prevent, detect, and avoid the Data Breach from occurring by following best information security practices to secure Plaintiff's and Class Members' PII, Defendants caused Plaintiff's and Class Members' PII to be disclosed and misappropriated to the public and unauthorized third parties beyond Plaintiff's and the Class Members' confidence, and without their express permission.

120.   But for Defendants' disclosure of Plaintiff's and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and/or used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' PII, as well as the resulting damages.

121.   The injury and harm Plaintiff and the Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiff's and Class Members' PII. Defendants knew their computer systems and technologies for accepting, securing, and storing Plaintiff's and Class Members' PII had serious security vulnerabilities because Defendants failed to observe basic information security practices or correct known security vulnerabilities.

122.   As a direct and proximate result of Defendants' breach of confidence, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit

scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## THIRD CAUSE OF ACTION
## INJUNCTIVE AND DECLARATORY RELIEF

123.  Plaintiff restates, realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

124.  Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

125.  An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard its users' PII, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and the Class Members from further data breaches that compromise their PII. Plaintiff and Class Members remain at imminent risk that further compromises of their PII will occur in the future. This is true even if they are not actively using Defendants' services.

126.  Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.  Defendants continue to owe a legal duty to secure users' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, the CCRA, and various state statutes; and

   b.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class

Members' PII.

127.   The Court also should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. §2202, requiring Defendants to employ adequate security practices consistent with law and industry standards to protect PII.

128.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

129.   The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs, Plaintiff and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

130.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating additional injuries that would result to Plaintiff, Class Members, and other individuals whose PII would be further compromised.

### **FOURTH CAUSE OF ACTION**
### **CALIFORNIA'S UNFAIR COMPETITION LAW**
### **Cal. Bus. & Prof. Code §§ 17200, et seq.**

131.   Plaintiff restates, realleges and incorporate by reference all preceding paragraphs, as if fully set forth herein.

132.   Defendants are a "person" as defined by Cal. Bus. & Prof. Code § 17201.

133.   Defendants violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

134.   Defendants' unfair acts and practices include:

    a.   Defendants failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Defendants failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents in the education sector. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and Class Members whose PII has been compromised.

    b.   Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 et seq., and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 et seq.

    c.   Defendants' failure to implement and maintain reasonable security measures also lead to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because

consumers could not know of Defendants' inadequate security, consumers could not have reasonably avoided the harms that Defendants caused.

d. Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

135. Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), the FTC Act, 15 U.S.C. § 45, California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, et seq., and California common law.

136. Defendants' unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and the Class Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the DTC Act, 15 U.S.C. § 45, California's Customer Records Ac, Cal. Civ. Code §§ 1798.80, et seq., and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, et seq., which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and the Class Members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq.; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 et seq.;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*

137.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

138.  Defendants intended to mislead Plaintiff and the Class Members and induce them to rely on their misrepresentations and omissions.

139.  Had Defendants disclosed that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue

in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiff's and the Class Members' PII without advising Plaintiff and the Class Members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Class Members' PII. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

140. Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

141. As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described herein.

142. Plaintiff, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiff's and Class Members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests the following relief:

a. An Order certifying this case as a class action;

CLASS ACTION COMPLAINT          35

b.  An Order appointing Plaintiff as the class representatives;

c.  An Order appointing undersigned counsel as class counsel;

d.  For an award of restitution or disgorgement, in an amount to be determined;

e.  For injunctive and declaratory relief, as may be determined appropriate, to include:

    i.  Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.  Requiring Defendants to protect, including through adequate encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.  Requiring Defendants to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendants can provide the Court a reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the Class Members;

    iv.  Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

    v.  Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

    vi.  Requiring Defendants to audit, test, and train their personnel regarding any new or modified procedures;

vii.   Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' networks are compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.   Requiring Defendants to conduct regular database scanning and security checks;

ix.   Requiring Defendants to establish an information security training program that includes at least annual information security training, including phishing and spoofing awareness training, for all employees, with additional training to be provided as appropriate based upon employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

x.   Requiring Defendants to routinely and continually conduct internal training and education, at least annually, to inform security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xi.   Requiring Defendants to implement, maintain, regularly review, and revise as necessary, a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xii.   Requiring Defendants to meaningfully educate all class members about the threats they face as a result of the loss

of their PII to third parties, as well as the steps affected individuals must take to protect themselves; and

xiii.   Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from its servers; and

xiv.   Requiring Defendants to provide ten years of identity theft and fraud protection services to Plaintiff and Class Members;

f.   For an award of compensatory, consequential, statutory and general damages, including nominal damages, as allowed by law in an amount to be determined;

g.   An award of costs and expenses;

h.   For prejudgment interest on all amounts awarded;

i.   An award of attorneys' fees; and

j.   Such other and further relief as this court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a jury trial as to all issues triable by a jury.

DATED this 4th day of May 2021.

By ___/s/ Michael F. Ram_____

Michael F. Ram (SBN 104805)
Marie N. Appel (CA SBN 187483)
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone:  (415) 358-6913
Facsimile:  (415) 358-6923
mram@forthepeople.com

mappel@forthepeople.com

Jean S. Martin*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jeanmartin@forthepeople.com

Micah S. Adkins*
THE ADKINS FIRM, P.C.
1025 Westhaven Blvd., Suite 220
Franklin, Tennessee 37064
Telephone:  (615) 370-9659
michaeladkins@itsyourcreditreport.com

Counsel for Plaintiff and the Putative Class

*Motions for *pro hac vice* admission to be filed